UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Derivatively on behalf of DaVITA INC.,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL J. DIAZ, CHARLES G. BERG, CAROL ANTHONY DAVIDSON, PETER T. GRAUER, JOHN M. NEHRA, WILLIAM L. ROPER, ROGER J. VALINE, PAMELA M. ARWAY, BARBARA J. DESOER, KENT J. THIRY, JAMES K. HILGER, ROBERT J. MARGOLIS and GARRY E. MENZEL,<br><br>Defendants,<br><br>– and –<br><br>DaVITA INC., a Delaware Corporation,<br><br>Nominal Defendant. | Civil Action No.<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF §14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND UNJUST ENRICHMENT**

## INTRODUCTION

1. This is a shareholder derivative action on behalf of nominal defendant DaVita Inc. ("DaVita" or the "Company"). DaVita is the parent company of DaVita Kidney Care and DaVita HealthCare Partners. DaVita Kidney Care is a leading provider of kidney care in the United States, delivering dialysis services to patients with chronic kidney failure and end stage renal disease ("ESRD") and providing related lab services at outpatient dialysis centers and acute inpatient dialysis and related laboratory services at approximately 900 hospitals in the United States.

2. Defendants are certain of DaVita directors – defendants Pamela M. Arway, Charles G. Berg, Carol Anthony Davidson, Barbara J. Desoer, Paul J. Diaz, Peter T. Grauer, John M. Nehra, William L. Roper and Roger J. Valine; DaVita's Chief Executive Officer ("CEO"), defendant Kent J. Thiry, and Chief Accounting Officer ("CAO") and Chief Financial Officer, Kidney Care ("CFO"), defendant James K. Hilger; and DaVita's former director and its former CFO – defendants Robert J. Margolis and Garry E. Menzel, respectively (together, "defendants").

3. As DaVita's corporate fiduciaries, defendants owed DaVita fiduciary duties of loyalty and care – the highest duties known to the law. Nonetheless, while under the stewardship of defendants, DaVita improperly steered renal care patients with government-subsidized health insurance into private health insurance plans to maximize corporate profits. As a result of this scheme, DaVita was able to bill private health insurers over $4,000 for dialysis services being offered to Medicaid and Medicare eligible patients for $300 or less.

4. To induce patients to obtain private health insurance, DaVita explained that the American Kidney Fund would pay their health insurance premiums. In turn, the

American Kidney Fund would use donations received from renal care providers, such as DaVita, to reimburse itself for the patients' healthcare premiums.

5. DaVita's patient steering scheme continued unabated until mid-2016. Then, on August 18, 2016, the Centers for Medicare & Medicaid Services ("CMS") initiated a public request for information about the steering of Medicare and Medicaid patients into other private healthcare plans. The CMS also announced that it was considering financial penalties against dialysis providers who steered individuals eligible for Medicare into Affordable Care Act ("ACA") plans.

6. As 2016 continued to unfold, scrutiny of DaVita's patient steering practices increased. For example, on October 23, 2016, the *St. Louis Post-Dispatch* published a report stating that internal e-mails from DaVita showed that the Company targeted patients in a campaign to get them to purchase private insurance they did not necessarily need, saying that their monthly premiums would be paid by a nonprofit foundation. The *St. Louis Post* article called the Company's efforts "coordinated" and noted that DaVita was financially incentivized to steer patients away from government subsidized healthcare programs and into private insurers. As a result of monetary concerns about DaVita's practices, the trading price of DaVita stock declined, falling from $67.65 on August 18, 2016 to $58.10 per share on October 24, 2016, wiping out more than $1 billion in once valuable shareholders' equity.

7. Ultimately, on October 31, 2016, DaVita issued a press release announcing that it would be forced to suspend support for applications to the American Kidney Fund for charitable premium assistance by patients enrolled in certain government healthcare plans. On the same date, the Company disclosed that the suspension would result in a reduction to DaVita's annualized operating income of up to approximately $140 million before any offsets, or about 12% of DaVita's 2015 operating income. Moreover, on January 6, 2017,

*The Wall Street Journal* reported that the U.S. Department of Justice is "probing a controversial arrangement under which kidney-care companies support charitable efforts to help patients pay health-insurance premiums, according to disclosures from major dialysis providers."

8. Although DaVita has been severely injured, defendants have not fared nearly so badly. On the contrary, defendants have collectively pocketed more than $15.3 million in fees, salary, incentive-based compensation payments and other benefits that were not justified in light of DaVita's performance while under their stewardship. These payments wasted valuable corporate assets and unjustly enriched defendants. Moreover, while DaVita common stock traded at artificially inflated prices, defendants Berg, Davidson, Nehra, Valine, Arway, Thiry, Hilger and Margolis collectively sold 487,665 shares of their personal DaVita stock for unlawful insider trading proceeds of more than $37.5 million.

9. Nevertheless, the DaVita Board of Directors ("Board") has not taken any legal action against the directors and officers responsible for this debacle. Nor will they, because each of the defendants face a substantial risk of liability in connection with the actions described herein. Accordingly, by this action, plaintiff seeks to vindicate DaVita's interests against it wayward fiduciaries.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty, abuse of control, gross mismanagement and unjust enrichment. In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the U.S. mail and the facilities of the national securities markets.

11. This Court has subject matter jurisdiction pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. The Court also has jurisdiction under §1332(a)(1) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, and supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

12. This Court has personal jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

13. Venue is proper in this Court under 28 U.S.C. §1391(b) because: (i) DaVita maintains its principal place of business in this District; (ii) one or more of the defendants either reside(s) in or maintain(s) executive offices in this District; and (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' participation in the wrongful acts detailed herein, occurred in this District.

## THE PARTIES

### Plaintiff

14. Plaintiff City of Warren Police and Fire Retirement System, by and through its Board of Trustees, is and has been a shareholder of DaVita since at least March 2012. Plaintiff's five trustees are each citizens of the state of Michigan.

### Nominal Defendant

15. Nominal defendant DaVita is a Delaware corporation with its principal executive offices located at 2000 16th Street, Denver, Colorado 80202. The Company is a

provider of kidney dialysis services in the United States for patients suffering from chronic kidney failure, also known as end stage renal disease. DaVita is a citizen of the States of Colorado and Delaware.

**Director Defendants**

16. Defendant Paul J. Diaz ("Diaz") has been a director of DaVita since July 2007. He also has served on the Compensation, Compliance, and Public Policy Committees of the DaVita Board. Diaz received at least $274,597 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. Defendant Diaz is a citizen of the State of Kentucky.

17. Defendant Charles G. Berg ("Berg") has been a director of DaVita since March 2007. He also has served on the Audit and Compliance Committees of the DaVita Board. Berg received at least $393,597 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. During the relevant period, Berg sold 11,636 shares of his personal DaVita stock for $942,632 in unlawful insider trading proceeds. Defendant Berg is a citizen of the State of Connecticut.

18. Defendant Carol Anthony Davidson ("Davidson") has been a director of DaVita since December 2010. He also has served on the Audit, Nominating and Governance, and Clinical Performance Committees of the DaVita Board. Davidson received at least $332,097 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. During the relevant period, Davidson sold 4,038 shares of his personal DaVita stock for $322,757 in unlawful insider trading proceeds. Defendant Davidson is a citizen of the State of Florida.

19. Defendant Peter T. Grauer ("Grauer") has been a director of DaVita since August 1994. He also has served on the Compensation and Nominating and Governance Committees of the DaVita Board. Grauer received at least $329,153 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. Defendant Grauer is a citizen of the State of Connecticut.

20. Defendant John M. Nehra ("Nehra") has been a director of DaVita since November 2000. He also has served on the Public Policy Committee of the DaVita Board. Nehra received at least $297,097 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. During the relevant period, Nehra sold 28,592 shares of his personal DaVita stock for $2.2 million in unlawful insider trading proceeds. Defendant Nehra is a citizen of the State of Maryland.

21. Defendant William L. Roper ("Roper") has been a director of DaVita since May 2001. He also has served on the Clinical Performance and Compliance Committees of the DaVita Board. Roper received at least $292,097 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. Defendant Roper is a citizen of the State of North Carolina.

22. Defendant Roger J. Valine ("Valine") has been a director of DaVita since June 2006. He also has served on the Audit, Compensation, and Nominating and Governance Committees of the DaVita Board. Valine received at least $282,097 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. During the relevant period, Valine sold 8,220 shares of his personal DaVita stock for $627,515 in unlawful insider trading proceeds. Defendant Valine is a citizen of the State of California.

23. Defendant Pamela M. Arway ("Arway") has been a director of DaVita since May 2009. She also has served on the Compensation, Nominating and Governance, and Public Policy Committees of the DaVita Board. Arway received at least $319,597 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under her stewardship. During the relevant period, Arway sold 19,850 shares of her personal DaVita stock for $1.4 million in unlawful insider trading proceeds. Defendant Arway is a citizen of the State of Florida.

24. Defendant Barbara J. Desoer ("Desoer") has been a director of DaVita since October 2015. She also has served on the Clinical Performance and Compliance Committees of the DaVita Board. Desoer received at least $55,513 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under her stewardship. Defendant Desoer is a citizen of the State of New York.

**Officer Defendants**

25. Defendant Kent J. Thiry ("Thiry") has been DaVita's CEO since October 1999. He also has been a director and Co-Chairman of DaVita from November 2012 to June 16, 2015, and Chairman since June 2015. Thiry received at least $11 million in salary and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. During the relevant period, Thiry sold 332,880 shares of his personal DaVita stock for $25.2 million in unlawful insider trading proceeds. Defendant Thiry is a citizen of the State of California.

26. Defendant James K. Hilger ("Hilger") has been DaVita's CAO since April 2010. Hilger received at least $1.1 million in salary and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. During the relevant period, Hilger sold 19,649 shares of his personal DaVita stock for $1.5

million in unlawful insider trading proceeds. Defendant Hilger is a citizen of the State of Washington.

**Former Director and Officer Defendants**

27. Defendant Robert J. Margolis ("Margolis") served as a director and Co-Chairman of DaVita from November 2012 to June 16, 2015. He also has served on the Clinical Performance and Public Policy Committees of the DaVita Board. Margolis received at least $85,147 in directors' fees and performance-based compensation from DaVita not justified by the Company's performance while under his stewardship. During the relevant period, Margolis sold 62,800 shares of his personal DaVita stock for $5.2 million in unlawful insider trading proceeds. Defendant Margolis is a citizen of the State of California.

28. Defendant Garry E. Menzel ("Menzel") served as DaVita's CFO from November 2013 to May 2015. Menzel received at least $698,000 in salary and other compensation from DaVita not justified by the Company's performance while under his stewardship. Defendant Menzel is a citizen of the State of Massachusetts.

**THE FIDUCIARY DUTIES OF DAVITA'S DIRECTORS AND OFFICERS**

29. By reason of their current and/or former positions as DaVita's directors and/or officers and because of their ability to direct and controls the Company's business and corporate affairs, defendants owed DaVita and its shareholders a fiduciary duty to use their utmost ability to control and manage DaVita in an honest and lawful manner. Towards this end, DaVita's directors and officers owed the Company and its shareholders fiduciary duties to exercise good faith and loyal and reasonable supervision over the Company' s management, policies, practices and internal controls.

30. As DaVita's directors and officers, defendants' fiduciary duties required them to, among other things: (i) ensure that the Company complied with its legal obligations and

requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public; (ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (iii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls; (iv) remain fully informed as to how DaVita conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as are necessary to comply with securities laws; (v) ensure that DaVita was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations, including the federal healthcare laws, rules and regulations and state corporation laws; and (vi) refrain from breaching their duty of loyalty to the Company by adopting practices and procedures and controls inconsistent with their duty of legal compliance.

31. The Audit Committee Charter of the DaVita Board confirms the fiduciary responsibility of the directors, providing, in relevant part, as follows:

> I. <u>Audit Committee Purpose</u>
>
> The Audit Committee (the "Committee") is appointed by the Board of Directors (the "Board") of DaVita Inc. (the "Company") to assist the Board in fulfilling its oversight responsibilities in connection with the financial reporting process, the system of internal control over financial reporting, the audit process and the Company's process for monitoring compliance with laws and regulations. The primary duties and responsibilities of the Committee are to:
>
> - Monitor and oversee: (i) the quality and integrity of the Company's consolidated financial statements and related footnotes and other

related disclosures; (ii) the integrity and effectiveness of the Company's system of internal control over financial reporting; (iii) the Company's compliance with legal and regulatory requirements (including healthcare compliance in coordination with the Board's Compliance Committee); (iv) the independence, qualifications, and performance of the Company's independent registered public accounting firm (including a review of the scope and results of its audit); (v) the Company's internal audit function; (vi) the effectiveness of the Company's disclosure controls and procedures; and (vii) compliance with ethical standards.

* * *

IV. Audit Committee Responsibilities and Duties

The Committee will carry out the below described responsibilities and duties with respect to its areas of oversight.

* * *

The Committee will carry out the following responsibilities:

Oversight of Financial Reporting

- Review significant accounting and reporting matters, including complex or unusual transactions and assess the integrity of the Company's financial reports, including disclosures and internal control over financial reporting through consultation with management, the independent registered public accounting firm, and the internal auditors.

- Review significant risk areas, the Company's guidelines and policies for addressing these risk areas, the steps management has taken to monitor, manage, and report such exposures, and review and evaluate the Company's policies with respect to enterprise risk assessment and enterprise risk management.

- Review with management and the independent registered public accounting firm and the internal audit department the results of the audit, including significant findings together with management's responses.

- Review regulatory pronouncements and understand their impact on the financial statements.

- Review other sections of the annual report and related regulatory filings before release and assess the accuracy and completeness of the information.

- Meet to review and discuss with management and the independent registered public accounting firm the Company's annual audited financial statements and, as applicable, quarterly financial results, including related disclosures, the content and basis for reports relating to internal control over financial reporting, and Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") and the Audit Committee Report included in the Company's reports and statements filed under the Securities Exchange Act of 1934, prior to filing or distribution.

* * *

- Review the Company's earnings press release, financial information and earnings guidance provided to analysts and ratings agencies, paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information. Such discussions may be done generally. Provided that such discussions have taken place, the Committee Chair or other designated Committee member may represent the entire Committee for purposes of reviewing specific earnings releases and specific instances of guidance.

* * *

- Review with the Company's counsel any legal matters that may have a material impact on the Company's financial statements, including related disclosures, the Company's compliance with applicable laws, regulations, internal procedures, and material reports or inquiries received from governmental authorities.

* * *

- Review with the Chairman of the Disclosure Committee, prior to the filing of the Company's quarterly and annual reports, information considered for disclosure as part of the Disclosure Committee quarterly review process and changes made to the Company's public disclosure as a result of the Disclosure Committee review process.

32. The DaVita Code of Conduct further imposed obligations of legal compliance and fair and honest business practices upon defendants, providing, in relevant part, as follows:

***Our Responsibilities***

Compliance is everyone's responsibility:

- DaVita is committed to full compliance with federal and state healthcare program requirements.

- Read, understand and follow the Code and the Compliance Program.

- Seek guidance when in doubt.

- Avoid illegal, unethical or otherwise improper acts.

- Report any suspected violation of DaVita policies and procedures, laws or regulations applicable to DaVita's business or this Code.

- Assist authorized teammates with compliance inquiries, audits, investigations and other activities.

- Take responsibility and accountability for your actions.

- Notify Team Quest immediately if the government sanctions or excludes you from participation in any government funded program.

DaVita will take corrective action, to the extent allowed by law, against any teammate who fails to act in accordance with DaVita Policies and Procedures, applicable laws and regulations or this Code.

* * *

***Service To Our Patients***

Our patients value DaVita because we deliver quality care, and we hold ourselves to a higher standard. Keep the following principles in mind to help us maintain that high standard.

***1. QUALITY PATIENT CARE***

We make a difference in each patient's life by providing quality care. We treat all patients with warmth, respect and dignity, providing care that is both medically necessary and appropriate. We involve patients in treatment planning and decisions affecting their care whenever appropriate.

We make no unlawful distinction in the admission, transfer, discharge or care of patients based on race, ethnicity, religion, gender, sexual orientation, national origin, age, disability, veteran status or other protected-class status. Each of us is required to adhere to DaVita policies and procedures, laws and regulations regarding patient care, and this Code.

* * *

***Business Practices***

Our reputation is one of our most valuable assets. It is up to all of us to protect DaVita's reputation. We will comply with all laws and regulations relevant to our business and engage in fair and honest business practices.

## FACTUAL ALLEGATIONS

33. DaVita is a provider of kidney care in the United States, delivering dialysis services to patients with chronic kidney failure and ESRD.

34. Between at least May 2015 and November 2016, DaVita, while under the stewardship of defendants, issued a series of false and misleading statements and/or omitted adverse information about the Company's business, financial condition and operations. More particularly, defendants failed to disclose in DaVita's filings with the SEC and earnings releases that DaVita was improperly steering patients eligible for government funded health insurance to private healthcare plans in order to charge higher reimbursement rates for dialysis care. Towards this end, for example, on May 4, 2015, defendants caused DaVita to announce its financial results for the first quarter of 2015, ended March 31, 2015, in a Form 8-K filed with the SEC. The Form 8-K was reviewed and approved by the Board. The Form 8-K stated, in relevant part, as follows:

> ***Financial and operating highlights include***:
>
> * * *
>
> - **Volume**: Total U.S. dialysis treatments for the first quarter of 2015 were 6,262,635, or 81,758 treatments per day, representing a per day increase of 4.5% over the first quarter of 2014. Non-acquired treatment growth in the first quarter of 2015 was 3.9% over the first quarter of 2014 and normalized non-acquired treatment growth in the first quarter of 2015 was 4.5% over the first quarter of 2014.
>
> * * *
>
> - **Center Activity**: As of March 31, 2015, we provided dialysis services to a total of approximately 181,000 patients at 2,290 outpatient dialysis centers, of which 2,197 centers are located in the United States and 93 centers are located in ten countries outside of the United States. During the first quarter of 2015, we opened a total of 18 new dialysis centers, acquired one dialysis center, and closed two dialysis centers in the United States. We also opened two new dialysis centers outside of the United States.

35. As to DaVita's outlook, the Form 8-K stated, in relevant part, as follows:

**Outlook**

- We are updating our consolidated operating income for 2015 to now be in the range of $1.800 billion to $1.925 billion.

  Our previous consolidated operating income guidance for 2015 was in the range of $1.750 billion to $1.900 billion.

- We are updating our operating income for Kidney Care for 2015 to now be in the range of $1.575 billion to $1.650 billion.

  Our previous operating income guidance for Kidney Care for 2015 was in the range of $1.525 billion to $1.625 billion.

- We still expect our operating income for HCP for 2015 to be in the range of $225 million to $275 million.

- We still expect our consolidated operating cash flow for 2015 to be in the range of $1.500 billion to $1.700 billion.

36. On May 5, 2015, defendants caused DaVita to file its Quarterly Report on Form 10-Q with the SEC for the first quarter of 2015. The Form 10-Q was reviewed and approved by the Board, signed by defendant Hilger, and reiterated the Company's first quarter 2015 financial results reported on May 4, 2015. In addition, the Form 10-Q included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Thiry and Hilger, certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37. As to the Company's dialysis revenues and operating income, the Form 10-Q stated, in relevant part, as follows:

*Net revenues*

* * *

Dialysis and related lab services' net revenues for the first quarter of 2015 increased by approximately $114 million, or approximately 5.8%, as compared to the first quarter of 2014. The increase in net revenues in the first quarter of 2015 was principally due to strong volume growth from additional treatments. The increase in the number of treatments was

> primarily attributable to strong acquired and non-acquired treatment growth. The average dialysis revenue per treatment also increased by approximately $5 in the first quarter of 2015 as compared to the first quarter of 2014. The increase in our average dialysis revenue per treatment was primarily due to an increase in some of our average commercial payment rates and improvements in our commercial payor mix. Dialysis and related services net revenues were negatively impacted by an increase in the provision for uncollectible accounts.
>
> * * *
>
> *Segment operating income*
>
> * * *
>
> Dialysis and related lab services' operating income for the first quarter of 2015 decreased by approximately $491 million as compared to the first quarter of 2014, including a $495 million accrual for an estimated loss contingency in the first quarter of 2015. Excluding this item, adjusted operating income would have increased by $4 million, primarily attributable to strong volume growth in revenues from additional treatments as a result of non-acquired treatment growth and growth through acquisitions, improved productivity and higher average dialysis revenue per treatment of $5. Adjusted dialysis and related lab services operating income was negatively impacted by an increase in labor and benefit costs, long-term incentive compensation, pharmaceutical unit costs, an increase in the provision for uncollectible accounts and an increase in professional fees for legal matters.

38. As a result of defendants' positive statements, DaVita stock traded at artificially inflated prices. While DaVita shares traded at these artificially inflated prices, defendants Hilger, Nehra and Margolis, in breach of their fiduciary duties, sold 87,328 shares of their personal DaVita stock for insider trading proceeds of more than $7.2 million.

39. On August 4, 2015, defendants caused DaVita to announce its financial results for the second quarter of 2015, ended June 30, 2015, in a Form 8-K filed with the SEC. The Form 8-K was reviewed and approved by the Board. For the quarter, the Company reported net income of $170 million, or $0.78 per share, on revenue of $3.4 billion, compared to net income of $148 million, or $0.68 per share, on revenue of $3.1 billion for the same period in the prior year.

40. The August 4, 2015 Form 8-K further stated, in relevant part, as follows:

> DaVita HealthCare Partners Inc. today announced results for the quarter ended June 30, 2015. . . . Net income attributable to DaVita HealthCare Partners Inc. for the three months ended June 30, 2015 . . . was $170 million, or $0.78 per share.
>
> * * *
>
> Net income attributable to DaVita HealthCare Partners Inc. for the three and six months ended June 30, 2014 . . . was $148 million and $331 million, or $0.68 and $1.53 per share, respectively.
>
> ***Financial and operating highlights include***:
>
> * * *
>
> - **Volume**: Total U.S. dialysis treatments for the second quarter of 2015 were 6,463,058, or 82,860 treatments per day, representing a per day increase of 4.3% over the second quarter of 2014. Non-acquired treatment growth and normalized non-acquired treatment growth in the second quarter of 2015 were both 3.7% over the second quarter of 2014.
>
> * * *
>
> - **Center Activity**: As of June 30, 2015, we provided dialysis services to a total of approximately 184,000 patients at 2,306 outpatient dialysis centers, of which 2,210 centers are located in the United States and 96 centers are located in ten countries outside of the United States. During the second quarter of 2015, we opened a total of 13 new dialysis centers in the United States. We also acquired one and opened two new dialysis centers outside of the United States.

41. As to DaVita's outlook, the Form 8-K stated, in relevant part, as follows:

> **Outlook**
>
> - We are updating the low end of our consolidated operating income for 2015 to now be in the range of $1.825 billion to $1.925 billion.
>
>   Our previous consolidated operating income guidance for 2015 was in the range of $1.800 billion to $1.925 billion.
>
> - We are also updating the low end of our operating income for Kidney Care for 2015 to now be in the range of $1.600 billion to $1.650 billion.

> Our previous operating income guidance for Kidney Care for 2015 was in the range of $1.575 billion to $1.650 billion.
>
> - We still expect our operating income for HCP for 2015 to be in the range of $225 million to $275 million.
> - We are updating our consolidated operating cash flow for 2015 to now be in the range of $1.600 billion to $1.750 billion.
>
> Our previous consolidated operating cash flow for 2015 was in the range of $1.500 billion to $1.700 billion.

42. On August 5, 2015 defendants caused DaVita to file its Quarterly Report on Form 10-Q with the SEC for the second quarter of 2015. The Form 10-Q was reviewed and approved by the Board, signed by defendant Hilger and reiterated the Company's second quarter 2015 financial results reported on August 4, 2015. In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Thiry and Hilger certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

43. As to the Company's dialysis revenues and operating income, the Form 10-Q stated, in relevant part, as follows:

> *Net revenue*s
>
> * * *
>
> Dialysis and related lab services' net revenues for the second quarter of 2015 increased by approximately $129 million, or approximately 6.4%, as compared to the second quarter of 2014. The increase in net revenues was principally due to volume growth from additional treatments and an increase in our average dialysis revenue per treatment of approximately $8. The increase in the number of treatments was primarily attributable to acquired and non-acquired treatment growth. The increase in our average dialysis revenue per treatment was primarily due to an increase of our average commercial payment rates and improvements in our commercial payor mix. Dialysis and related services net revenues were negatively impacted by an increase in our provision for uncollectible accounts.
>
> Dialysis and related lab services' net revenues for the six months ended June 30, 2015 increased by approximately $243 million, or approximately 6.1%, as compared to the same period in 2014. The increase

> in dialysis and related lab services' net revenues was due to volume growth from additional treatments and an increase in our average dialysis revenue per treatment of approximately $7. The increase in our average dialysis revenue per treatment was due to improvements in our commercial payor mix and an increase in our average commercial payments rates. Dialysis and related lab services' net revenues were negatively impacted by an increase in our dialysis provision for uncollectible accounts.
>
> * * *
>
> *Segment operating income*
>
> * * *
>
> Dialysis and related lab services' operating income for the second quarter of 2015 increased by approximately $30 million as compared to the second quarter of 2014. Operating income increased primarily attributable to volume growth in revenues from additional treatments as a result of non-acquired treatment growth and growth through acquisitions, improved productivity and an increase in our average dialysis revenue per treatment of approximately $8, as discussed above, and a decrease in insurance costs. Dialysis and related lab services' operating income was negatively impacted by increases in labor and benefit costs, long-term incentive compensation costs, pharmaceutical costs, our provision for uncollectible accounts and professional fees for legal and compliance matters.
>
> Dialysis and related lab services' operating income for the six months ended June 30, 2015 decreased by approximately $462 million as compared to the same period in 2014, including a $495 million settlement charge recorded in the first quarter of 2015. Excluding this item from the six months ended June 30, 2015, adjusted operating income would have increased by $33 million. The increase in adjusted operating income was primarily due to an increase in our average dialysis revenue per treatment of $7, as discussed above, and a decrease in insurance costs. Dialysis and related lab services adjusted operating income was negatively impacted by an increase in labor and benefit costs, as well as, an increase long-term incentive compensation costs, higher pharmaceutical costs, an increase in the provision for uncollectible accounts and an increase in professional fees for legal and compliance matters.

44. As a result of defendants' positive statements, DaVita stock traded at artificially inflated prices. While DaVita shares traded at these artificially inflated prices, defendants Berg and Davidson, in breach of their fiduciary duties, sold 15,674 shares of their personal DaVita stock for insider trading proceeds of more than $1.2 million.

45. On November 3, 2015, defendants caused DaVita to announce its financial results for the third quarter of 2015, ended September 30, 2015, in a Form 8-K filed with the SEC. The Form 8-K was reviewed and approved by the Board. For the quarter, the Company reported net income of $216 million, or $1.00 per share, on revenue of $3.5 billion, compared to net income of $184 million, or $0.85 per share, on revenue of $3.2 billion for the same period in the prior year.

46. The November 3, 2015 Form 8-K further stated, in relevant part, as follows:

> DaVita HealthCare Partners Inc. today announced results for the quarter ended September 30, 2015. Net income attributable to DaVita HealthCare Partners Inc. for the three months ended September 30, 2015 was $216 million, or $1.00 per share.
>
> * * *
>
> *Financial and operating highlights include*:
>
> * * *
>
> - **Volume**: Total U.S. dialysis treatments for the third quarter of 2015 were 6,611,799, or 83,694 treatments per day, representing a per day increase of 4.2% over the third quarter of 2014. Non-acquired treatment growth and normalized non-acquired treatment growth in the third quarter of 2015 were 4.0% and 3.5%, respectively.
>
> * * *
>
> - **Center Activity**: As of September 30, 2015, we provided dialysis services to a total of approximately 187,000 patients at 2,329 outpatient dialysis centers, of which 2,225 centers are located in the United States and 104 centers are located in ten countries outside of the United States. During the third quarter of 2015, we acquired five dialysis centers, opened a total of 15 new dialysis centers, and closed five dialysis centers in the United States. We also acquired six, and opened two new dialysis centers outside of the United States.

47. As to DaVita's outlook, the Form 8-K stated, in relevant part, as follows:

> ***Outlook***
>
> - We are updating our consolidated operating income for 2015 to now be in the range of $1.870 billion to $1.915 billion.

> Our previous consolidated operating income guidance for 2015 was in the range of $1.825 billion to $1.925 billion.
>
> - We are also updating our operating income for Kidney Care for 2015 to now be in the range of $1.630 billion to $1.655 billion.
>
>   Our previous operating income guidance for Kidney Care for 2015 was in the range of $1.600 billion to $1.650 billion.
>
> - We are updating our operating income for HCP for 2015 to now be in the range of $240 million to $260 million.
>
>   Our previous operating income guidance for HCP for 2015 was in the range of $225 million to $275 million.
>
> - We are updating our consolidated operating cash flows for 2015 to now be in the range of $1.675 billion to $1.775 billion.
>
>   Our previous consolidated operating cash flow for 2015 was in the range of $1.600 billion to $1.750 billion.

48. On November 5, 2015, defendants caused DaVita to file its Quarterly Report on Form 10-Q with the SEC for the third quarter of 2015. The Form 10-Q was reviewed and approved by the Board, signed by defendant Hilger, and reiterated the Company's third quarter 2015 financial results reported on November 3, 2015. In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Thiry and Hilger, certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49. As to the Company's dialysis revenues and operating income, the Form 10-Q stated, in relevant part, as follows:

> *Net revenues*
>
> Dialysis and related lab services' net revenues for the third quarter of 2015 increased by approximately $47 million, or approximately 2.2%, as compared to the second quarter of 2015. The increase was primarily due to volume growth from acquired and non-acquired treatment growth and one additional treatment day in the third quarter of 2015 as compared to the second quarter of 2015. The average dialysis revenue per treatment remained flat quarter over quarter.

> Dialysis and related lab services' net revenues for the third quarter of 2015 increased by approximately $125 million, or approximately 6.0%, as compared to the third quarter of 2014. The increase in net revenues was principally due to volume growth from additional treatments and an increase in our average dialysis revenue per treatment of approximately $7. The increase in the number of treatments was primarily attributable to acquired and non-acquired treatment growth. The increase in our average dialysis revenue per treatment was primarily due to an increase in our average commercial payment rates and improvements in our commercial payor mix, partially offset by an increase in our provision for uncollectible accounts.
>
> * * *
>
> *Segment operating income*
>
> Dialysis and related lab services' operating income for the third quarter of 2015 increased by approximately $24 million as compared to the second quarter of 2015. The increase in operating income was primarily due to acquired and non-acquired treatment growth in existing centers as well as one additional treatment day in the third quarter of 2015. Operating income was positively impacted by lower professional fees, a decrease in travel expenses related to management meetings, and a decrease in general and administrative costs, partially offset by increases in labor costs, pharmaceutical costs, and general and professional insurance costs.
>
> Dialysis and related lab services' operating income for the third quarter of 2015 increased by approximately $62 million as compared to the third quarter of 2014, including a loss contingency accrual of $17 million recorded in the third quarter of 2014. Excluding this item from the third quarter of 2014, adjusted dialysis and related lab services' operating income would have increased by $45 million. This increase in adjusted operating income was primarily attributable to volume growth in revenues from additional treatments as a result of acquired and non-acquired treatment growth, an increase in our average dialysis revenue per treatment of approximately $7, as discussed above, improved productivity and lower general and professional insurance costs. These increases were partially offset by increases in labor and benefits costs, professional fees, occupancy costs and other direct operating expenses.

50. As a result of defendants' positive statements, DaVita stock traded at artificially inflated prices. While DaVita shares traded at these artificially inflated prices, defendant Thiry, in breach of his fiduciary duties, sold 300,000 shares of his personal DaVita stock for insider trading proceeds of more than $22.6 million.

51. On February 11, 2016, defendants caused DaVita to announce its financial results for the fourth fiscal quarter and year ended December 31, 2015, in a Form 8-K filed with the SEC. The Form 8-K was reviewed and approved by the Board. For the quarter, the Company reported a net loss of ($6) million, or ($0.03) per share, on revenue of $3.5 billion, compared to net income of $208 million, or $0.96 per share, on revenue of $3.3 million for the same period in the prior year. For fiscal year 2015, the Company reported net income of $270 million, or $1.25 per share, on revenue of $13.7 billion, compared to net income of $723 million, or $3.33 per share, on revenue of $12.7 billion for fiscal year 2014.

52. The February 11, 2016 Form 8-K further stated, in relevant part, as follows:

> DaVita HealthCare Partners Inc. today announced results for the quarter and year ended December 31, 2015. . . . Net loss attributable to DaVita HealthCare Partners Inc. for the quarter ended December 31, 2015 . . . was $(6) million, or $(0.03) per share.
>
> . . . Net income attributable to DaVita HealthCare Partners Inc. for the year ended December 31, 2015 . . . was $270 million, or $1.25 per share.
>
> Net income attributable to DaVita HealthCare Partners Inc. for the quarter ended December 31, 2014 was $208 million, or $0.96 per share. . . . Net income attributable to DaVita HealthCare Partners Inc. for the year ended December 31, 2014 . . . was $723 million, or $3.33 per share.
>
> * * *
>
> ***Financial and operating highlights include***:
>
> * * *
>
> - **Volume**: Total U.S. dialysis treatments for the fourth quarter of 2015 were 6,649,227, or 84,061 treatments per day, representing a per day increase of 3.2% over the fourth quarter of 2014. Normalized non-acquired treatment growth in the fourth quarter of 2015 as compared to the fourth quarter of 2014 was 3.7%.
>
> * * *
>
> - **Center Activity**: As of December 31, 2015, we provided dialysis services to a total of approximately 190,000 patients at 2,369 outpatient dialysis centers, of which 2,251 centers are located in the United States and 118 centers are located in ten countries outside of

> the United States. During the fourth quarter of 2015, we opened a total of 26 new dialysis centers and sold one dialysis center in the United States. We also acquired 14 dialysis centers and opened one new dialysis center outside of the United States.

53. As to DaVita's outlook, the Form 8-K stated, in relevant part, as follows:

> ***Outlook***
>
> - We expect our consolidated operating income for 2016 to be in the range of $1.800 billion to $1.950 billion.
> - We expect our operating income for Kidney Care for 2016 to be in the range of $1.625 billion to $1.725 billion.
> - We expect our operating income for HCP for 2016 to be in the range of $175 million to $225 million.
> - We expect our consolidated operating cash flows for 2016 to be in the range of $1.550 billion to $1.750 billion.

54. On February 26, 2016, defendants caused DaVita to file its Annual Report on SEC Form 10-K for the fourth quarter and year-ended December 31, 2015. The Annual Report was reviewed and approved by the Board, signed by Thiry, Hilger, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper and Valine, and reiterated the Company's fourth quarter and year-end financial results reported on February 11, 2016. In addition, the Form 10-K included certifications pursuant to SOX signed by defendants Thiry and Hilger, certifying that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55. As to the Company's dialysis business for 2015, the Form 10-K stated, in relevant part, as follows:

> Our U.S. dialysis and related lab services business is a leading provider of kidney dialysis services through a network of 2,251 outpatient dialysis centers in 46 states and the District of Columbia, serving a total of approximately 180,000 patients. We also provide acute inpatient dialysis services in approximately 900 hospitals. We estimate that we have approximately a 36% market share in the U.S. based upon the number of patients that we serve. In 2015, our overall network of U.S. outpatient dialysis centers net increased by 72 dialysis centers primarily as a result of

the opening new dialysis centers and from acquisitions of dialysis centers. In addition, the overall number of patients that we serve in the U.S. increased by approximately 4.1% in 2015 as compared to 2014. All references in this document to dialysis and related lab services refer only to our U.S. dialysis and related lab services business.

* * *

We believe our national scale, size and commitment to our patients, among other things, allows us to provide industry-leading quality care with superior clinical outcomes that attracts patients, referring physicians, and qualified medical directors to our network, which provides our dialysis patient base with a large number of out-patient dialysis centers to choose from with convenient locations and access to a full range of other integrated services which provides us the ability to effectively and efficiently manage a patient's care and certain costs while still maintaining strong legal and compliance programs.

Approximately 62% of our 2015 consolidated net revenues were derived directly from our dialysis and related lab services business. Approximately 79% of our 2015 dialysis and related lab services revenues were derived from outpatient hemodialysis services in the 2,220 U.S. centers that we consolidate. Other dialysis services, which are operationally integrated with our dialysis operations, are peritoneal dialysis, home-based hemodialysis, hospital inpatient hemodialysis services and management and administrative services provided to minority-owned and non-owned dialysis centers. These services collectively accounted for the balance of our 2015 dialysis and related lab services revenues.

* * *

*Net revenues*

Dialysis and related lab services net revenues for 2015 increased by approximately $431 million, or 5.2%, from 2014. The increase in net revenues was primarily due to solid volume growth from additional treatments of approximately 4.0% due to an increase in non-acquired treatment growth at existing and new dialysis centers and an increase in the average dialysis revenue per treatment of approximately $6. The increase in the average dialysis revenue per treatment in 2015, as compared to 2014, was due to an increase in our average commercial payment rates and improvements in our commercial payor mix. Dialysis and related lab services net revenues were negatively impacted by an increase in the provision for uncollectible accounts of $53 million.

* * *

Approximately 66% of our total dialysis and related lab services revenues for the year ended December 31, 2015 were from government-

based programs, principally Medicare, Medicaid, and Medicare-assigned plans, representing approximately 89% of our total patients. Prior to 2015, we had experienced growth in our government-based patients that had been outpacing the growth in our commercial patients which had negatively impacted our average dialysis and related lab services revenue per treatment since we receive higher reimbursement rates from our commercial payors. However, in 2015, for the first time in several years, the growth of our commercial patients slightly outpaced the growth of our government-based patients as more of our patients are covered by commercial contracted plans. Less than 1% of our dialysis and related lab services revenues are due directly from patients. There is no single commercial payor associated with our dialysis and related lab services business that accounted for more than 10% of total dialysis and related lab services revenues for the year ended December 31, 2015.

On average, dialysis-related payment rates from contracted commercial payors are significantly higher than Medicare, Medicaid and other government program payment rates, and therefore the percentage of commercial patients as a relationship to total patients represents a major driver of our total average dialysis revenue per treatment. For a patient covered by a commercial insurance plan, Medicare generally becomes the primary payor after 33 months, which includes the three month waiting period, or earlier if the patient's commercial insurance plan coverage terminates. When Medicare becomes the primary payor, the payment rates we receive for that patient shifts from the commercial insurance plan rates to Medicare payment rates, which are significantly lower than commercial insurance rates. Medicare payment rates are insufficient to cover our costs associated with providing dialysis services, and therefore we lose money on each Medicare treatment that we provide.

Nearly all of our net earnings from our dialysis and related lab services are derived from commercial payors, some of which pay at established contract rates and others which pay negotiated payment rates based on our usual and customary fee schedule for our out-of-network patients, which are typically higher than commercial contracted rates. If we experience a net overall reduction in our contracted and non-contracted commercial payment rates as a result of negotiations, restrictions or changes to the healthcare regulatory system, including the potential impact of healthcare insurance exchanges, it could have a material adverse effect on our operating results.

* * *

*Segment operating income*

Dialysis and related lab services operating income for 2015 decreased by approximately $378 million as compared to 2014, which includes a settlement charge of $495 million in 2015 and a loss contingency accrual of $17 million in 2014. Excluding these items from their respective periods,

> dialysis and related lab services adjusted operating income for 2015 would have increased by $100 million. The increase in the adjusted operating income for 2015 as compared to 2014 was primarily due to solid treatment growth as a result of additional dialysis treatments and an increase in the average dialysis revenue per treatment of approximately $6, as described above. In addition, dialysis and related lab services adjusted operating income also increased due to improved productivity and lower general and professional insurance costs, partially offset by higher overall pharmaceutical costs, as described above, and an increase in our provision for uncollectible accounts of $53 million.

56. As a result of defendants' positive statements, DaVita stock traded at artificially inflated prices. While DaVita shares traded at these artificially inflated prices, defendant Arway, in breach of her fiduciary duties, sold 9,026 shares of her personal DaVita stock for insider trading proceeds of more than $595,716.

57. On May 4, 2016, defendants caused DaVita to announce its financial results for the first quarter of 2016, ended March 31, 2016, in a Form 8-K filed with the SEC. The Form 8-K was reviewed and approved by the Board. For the quarter, the Company reported net income of $97 million, or $0.47 per share, on revenue of $3.5 billion, compared to a net loss of ($111) million, or ($0.52) per share, on revenue of $3.2 million for the same period in the prior year.

58. The May 4, 2016, Form 8-K further stated, in relevant part, as follows:

> DaVita HealthCare Partners Inc. today announced results for the quarter ended March 31, 2016. . . . Net income attributable to DaVita HealthCare Partners Inc. for the quarter ended March 31, 2016 . . . was $97 million, or $0.47 per share.
>
> . . . Net loss attributable to DaVita HealthCare Partners Inc. for the quarter ended March 31, 2015 . . . was $(111) million, or $(0.52) per share.
>
> * * *
>
> ***Financial and operating highlights include***:
>
> * * *
>
> - **Volume**: Total U.S. dialysis treatments for the first quarter of 2016 were 6,639,874, or 85,236 treatments per day, representing a per day

increase of 4.3% over the first quarter of 2015. Normalized non-acquired treatment growth in the first quarter of 2016 as compared to the first quarter of 2015 was 4.1%.

* * *

- **Center Activity**: As of March 31, 2016, we provided dialysis services to a total of approximately 192,000 patients at 2,402 outpatient dialysis centers, of which 2,278 centers are located in the United States and 124 centers are located in ten countries outside of the United States. During the first quarter of 2016, we opened a total of 30 new dialysis centers and closed four dialysis centers in the United States. We also acquired one dialysis center and opened five new dialysis center outside of the United States.

59. As to DaVita's outlook, the Form 8-K stated, in relevant part, as follows:

**Outlook**

- We still expect our consolidated operating income for 2016 to be in the range of $1.800 billion to $1.950 billion.
- We still expect our operating income for Kidney Care for 2016 to be in the range of $1.625 billion to $1.725 billion.
- We still expect our operating income for HCP for 2016 to be in the range of $175 million to $225 million.
- We still expect our consolidated operating cash flow for 2016 to be in the range of $1.550 billion to $1.750 billion.

60. On May 4, 2016, defendants caused DaVita to file its Quarterly Report on Form 10-Q with the SEC for the first quarter of 2016. The Form 10-Q was reviewed and approved by the Board, signed by defendant Hilger, and reiterated the Company's first quarter 2016 financial results reported on the same date. In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Thiry and Hilger, certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61. As to the Company's dialysis revenues and operating income, the Form 10-Q stated, in relevant part, as follows:

*Net revenues*

* * *

Dialysis and related lab services' net revenues for the first quarter of 2016 increased by approximately $155 million, or approximately 7.5%, as compared to the first quarter of 2015. The increase in net revenues was principally due to volume growth from additional treatments, one additional treatment day in the first quarter of 2016 as compared to the first quarter of 2015, and an increase in our average dialysis revenue per treatment of approximately $5. The increase in the number of treatments was primarily attributable to acquired and non-acquired treatment growth. The increase in our average dialysis revenue per treatment was primarily due to an increase in our average commercial payment rates and improvements in our commercial payor mix.

* * *

*Segment operating income*

* * *

Dialysis and related lab services' operating income for the first quarter of 2016 increased by approximately $544 million as compared to the first quarter of 2015, including a loss contingency accrual of $495 million recorded in the first quarter of 2015. Excluding this item from the first quarter of 2015, adjusted dialysis and related lab services' operating income would have increased by $49 million. This increase in adjusted operating income was primarily attributable to volume growth in revenues from additional treatments as a result of acquired and non-acquired treatment growth, an increase in our average dialysis revenue per treatment of approximately $5, as discussed above, as well as one additional treatment day in the quarter. Adjusted operating income was negatively impacted by higher patient care costs driven by increases in labor and pharmaceutical unit costs.

62. As a result of defendants' positive statements, DaVita stock traded at artificially inflated prices. While DaVita shares traded at these artificially inflated prices, defendants Arway, Hilger, Nehra, Valine and Thiry, in breach of their fiduciary duties, sold 75,637 shares of their personal DaVita stock for insider trading proceeds of more than $5.7 million.

63. On May 10, 2016, defendants caused DaVita to file its 2016 Proxy Statement on Form DEF 14 A with the SEC ("2016 Proxy Statement"). The 2016 Proxy Statement was

reviewed and approved by defendants. The 2016 Proxy Statement included, among other things, a vote on the election of directors to the DaVita Board, as well as references to DaVita's Code of Conduct that purportedly required DaVita directors, officers and employees to adhere to ethical and legal standards. Defendants knew, or should have known, that the 2016 Proxy Statement was materially false and misleading when made, because, among other things, it did not disclose that DaVita was improperly steering patients eligible for government-subsidized health insurance plans into private healthcare insurance plans that paid higher reimbursement rates in order to maximize its corporate profits; and, as a result, a significant portion of DaVita's publicly reported revenues and earnings were unlawfully obtained. The 2016 Proxy Statement was also false and misleading because, among other things, it did not disclose that DaVita lacked effective internal controls and, as a result, the improper patient steering scheme flourished at DaVita, artificially inflating the Company's publicly reported financial results and financial statements.

64. On August 8, 2016, defendants caused DaVita to announce its financial results for the second quarter of 2016, ended June 30, 2016, in a Form 8-K filed with the SEC. The Form 8-K was reviewed and approved by the Board. For the quarter, the Company reported net income of $53 million, or $0.26 per share, on revenue of $3.7 billion, compared to net income of $170 million, or $0.78 per share, on revenue of $3.4 billion for the same period in the prior year.

65. The August 8, 2016 Form 8-K further stated, in relevant part, as follows:

> DaVita HealthCare Partners Inc. today announced results for the quarter ended June 30, 2016. Net income attributable to DaVita HealthCare Partners Inc. for the three months ended June 30, 2016 was $53 million, or $0.26 per share, which included goodwill impairment charges related to certain HCP reporting units, a gain on the partial sale of HCP's Tandigm Health (Tandigm) ownership interest, and a loss on the sale of our HCP Arizona business as discussed below.

* * *

***Financial and operating highlights include***:

* * *

- **Volume**: Total U.S. dialysis treatments for the second quarter of 2016 were 6,745,610, or 86,482 treatments per day, representing a per day increase of 4.4% over the second quarter of 2015. Normalized non-acquired treatment growth in the second quarter of 2016 as compared to the second quarter of 2015 was 4.3%.

* * *

- **Center Activity**: As of June 30, 2016, we provided dialysis services to a total of approximately 196,000 patients at 2,420 outpatient dialysis centers, of which 2,293 centers were located in the United States and 127 centers were located in 11 countries outside of the United States. During the second quarter of 2016, we opened a total of 15 new dialysis centers, acquired four dialysis centers and closed three dialysis centers in the United States. We also acquired two dialysis centers and opened one new dialysis center outside of the United States.

66. As to DaVita's outlook, the Form 8-K stated, in relevant part, as follows:

**Outlook**

* * *

- We are updating our adjusted consolidated operating income guidance for 2016 to be in the range of $1.785 billion to $1.875 billion.

  Our previous adjusted consolidated operating income guidance for 2016 was in the range of $1.800 billion to $1.950 billion.

- We are updating our operating income guidance for Kidney Care for 2016 to be in the range of $1.675 billion to $1.725 billion.

  Our previous operating income guidance for Kidney Care for 2016 was in the range of $1.625 billion to $1.725 billion.

- We are updating our adjusted operating income guidance for HCP for 2016 to be in the range of $110 million to $150 million.

  Our previous adjusted operating income guidance for HCP for 2016 was in the range of $175 million to $225 million.

- We are updating our consolidated operating cash flow for 2016 to be in the range of $1.600 billion to $1.750 billion.

  Our previous consolidated operating cash flow for 2016 was in the range of $1.550 billion to $1.750 billion.

67. On August 8, 2016, defendants caused DaVita to file its Quarterly Report on Form 10-Q with the SEC for the second quarter of 2016. The Form 10-Q was reviewed and approved by the Board, signed by defendant Hilger, and reiterated the Company's second quarter 2016 financial results reported on the same date. In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Thiry and Hilger, certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

68. As to the Company's dialysis revenues and operating income, the Form 10-Q stated, in relevant part, as follows:

> *Net revenues*
>
> * * *
>
> Dialysis and related lab services' net revenues for the second quarter of 2016 increased by approximately $110 million, or approximately 5.1%, as compared to the second quarter of 2015. The increase in net revenues was principally due to volume growth from additional treatments and an increase in our average dialysis revenue per treatment of approximately $3. The increase in the number of treatments was primarily attributable to acquired and non-acquired treatment growth. The increase in our average dialysis revenue per treatment was primarily due to improvements in our commercial payor mix and an increase in our average commercial payment rates.
>
> * * *
>
> *Segment operating income*
>
> * * *
>
> Dialysis and related lab services' operating income for the second quarter of 2016 increased by approximately $11 million as compared to the second quarter of 2015. This increase in operating income was primarily attributable to volume growth in revenues from additional treatments as a result of acquired and non-acquired treatment growth, and an increase in our

> average dialysis revenue per treatment of approximately $3, as discussed above. Operating income was negatively impacted by higher patient care costs driven by increases in labor and benefits costs, insurance costs and pharmaceutical unit costs.

69. On November 2, 2016, defendants caused DaVita to announce its financial results for the third quarter of 2016, ended September 30, 2016, in a Form 8-K filed with the SEC. The Form 8-K was reviewed and approved by the Board. For the quarter, the Company reported net income of $571 million, or $2.76 per share, on revenue of $3.7 billion, compared to net income of $216 million, or $1.00 per share, on revenue of $3.5 billion for the same period in the prior year.

70. The November 2, 2016 Form 8-K further stated, in relevant part, as follows:

> DaVita Inc. today announced results for the quarter ended September 30, 2016. Net income attributable to DaVita Inc. for the three months ended September 30, 2016 was $571 million, or $2.76 per share, which included a gain on changes in ownership interest upon the formation of the Asia Pacific dialysis joint venture (APAC JV) . . . .
>
> * * *
>
> Net income attributable to DaVita Inc. for the three months ended September 30, 2015 was $216 million, or $1.00 per share.
>
> * * *
>
> ***Financial and operating highlights include***:
>
> * * *
>
> - **Volume**: Total U.S. dialysis treatments for the third quarter of 2016 were 6,887,992, or 87,190 treatments per day, representing a per day increase of 4.2% over the third quarter of 2015. Normalized non-acquired treatment growth in the third quarter of 2016 as compared to the third quarter of 2015 was 4.4%.
>
> * * *
>
> - **Center Activity**: As of September 30, 2016, we provided dialysis services to a total of approximately 199,000 patients at 2,457 outpatient dialysis centers, of which 2,318 centers were located in the United States and 139 centers were located in 11 countries outside of the United States. During the third quarter of 2016, we opened a total

> of 28 new dialysis centers and closed three dialysis centers in the United States. We also acquired eight dialysis centers and opened four new dialysis center outside of the United States.

71. As to DaVita's outlook, the Form 8-K stated, in relevant part, as follows:

> **Outlook**
>
> * * *
>
> - We are updating our adjusted consolidated operating income guidance for 2016 to be in the range of $1.810 billion to $1.870 billion.
>
>   Our previous adjusted consolidated operating income guidance for 2016 was in the range of $1.785 billion to $1.875 billion.
>
> - We are updating our adjusted operating income guidance for Kidney Care for 2016 to be in the range of $1.695 billion to $1.725 billion.
>
>   Our previous operating income guidance for Kidney Care for 2016 was in the range of $1.675 billion to $1.725 billion.
>
> - We are updating our adjusted operating income guidance for DMG for 2016 to be in the range of $115 million to $145 million.
>
>   Our previous adjusted operating income guidance for DMG for 2016 was in the range of $110 million to $150 million.
>
> - We are updating our consolidated operating cash flow for 2016 to be in the range of $1.750 billion to $1.850 billion.
>
>   Our previous consolidated operating cash flow for 2016 was in the range of $1.600 billion to $1.750 billion.

72. In truth, defendants' statements referenced in ¶¶35-72 above were materially false and misleading when made and/or failed to disclose that: (i) DaVita was purposefully steering patients into unnecessary insurance plans in order to maximize corporate profits; (ii) the Company was using the American Kidney Fund as a vehicle to facilitate these improper practices; (iii) as a result, DaVita's revenues and earnings were unlawfully obtained; (iv) in turn, DaVita lacked effective internal controls over financial reporting; and (v) as a result of

the foregoing, defendants' statements about DaVita's business, finances and operations were materially false and misleading and/or lacked a reasonable basis when made.

**THE TRUTH EMERGES**

73. DaVita's patient scheme continued unabated until August 2016. Then, on August 18, 2016, the CMS issued a request for information "seeking public comment on concerns that some health care providers and provider-affiliated organizations may be steering people eligible for, or receiving, Medicare and/or Medicaid benefits into Affordable Care Act-compliant individual market plans, including Health Insurance Marketplace plans, for the purpose of obtaining higher reimbursement rates." The CMS stated:

> "Ensuring access to high quality patient care is a top priority for us. We are concerned about reports that some organizations may be engaging in enrollment activities that put their profit margins ahead of their patients' needs," said CMS Acting Administrator Andy Slavitt. "These actions can limit benefits for those who need them, potentially result in greater costs to patients, and ultimately increase the cost of Marketplace coverage for everyone."
>
> "It is improper to influence people away from Medicare or Medicaid coverage for the purpose of financial gain," said Shantanu Agrawal, M.D., CMS Deputy Administrator and Director of the Center for Program Integrity. "Our goal is to protect patients from being unduly influenced in their decisions about their health insurance options, and to protect the integrity of all the programs we oversee."
>
> Currently, third-party payment of premiums and cost sharing of qualified health plans in the individual market by health care providers such as physicians, medical facilities or affiliated non-profit organizations are discouraged, but the ultimate decision about accepting those payments are left to health insurance companies. This guidance does not apply to certain federal, state, or local government programs, Ryan White HIV/AIDS programs or Indian tribes, tribal organizations and urban Indian organizations, which are expressly permitted to pay insurance premiums for consumers under CMS regulations. Recently, concerns have been raised that certain providers or organizations affiliated with specific providers may steer consumers into individual market plans, including Marketplace health plans, because they would receive higher payment rates under a private plan than under Medicare or Medicaid.

74. Then, on October 23, 2016, the *St. Louis Post-Dispatch* published an article reporting that "[i]nternal emails from DaVita HealthCare Partners Inc. show the Denver-based company targeted some patients in a campaign to get them to buy insurance they didn't necessarily need, saying their monthly premiums would be paid by a nonprofit foundation." The article, entitled "DaVita encouraged some low-income patients to enroll in commercial plans," stated, in relevant part, as follows:

> DaVita, one of the nation's largest dialysis providers, with a major presence in St. Louis, had a financial incentive to get certain Medicaid-eligible dialysis patients to enroll in private insurance. Medicaid, the government-run health insurance program for low-income Americans, pays significantly less than traditional commercial insurance for dialysis treatment.
>
> Emily Bremer, a Clayton-based health insurance broker, said she first heard about kidney failure patients being targeted after one of her clients said he was encouraged by an employee of another dialysis-center company to enroll in a private insurance plan. Bremer said she was concerned because the plan described as best didn't include her client's current BJC HealthCare doctors and also had other limitations.
>
> Prior to the Affordable Care Act, patients with end-stage renal disease were typically denied commercial insurance because of the high cost of care. Because those patients couldn't get coverage, the federal government decided to allow individuals with failing kidneys to qualify for Medicare – the health insurance plan for the elderly – at any age. Some of those patients also may qualify for Medicaid, the taxpayer-funded health care program for some low-income Americans.
>
> In some cases, however, some patients with failing kidneys have not worked long enough to qualify for Medicare even with the grave diagnosis, leaving them eligible only for Medicaid. This was the population DaVita was targeting for commercial coverage, according to the company's emails, which were provided to the Post-Dispatch by an employee who asked not to be identified.
>
> Private insurers can pay as much as $4,000 per treatment, while government plans such as Medicaid or Medicare pay $300, according to a lawsuit filed in federal court in Florida by the nation's largest health insurer UnitedHealthcare against a separate dialysis chain, American Renal Associates. In Missouri, the Medicaid program pays dialysis centers $122.94 for each treatment, which does not include other monthly payments.

Dialysis filters out toxins from the blood, a normal function of healthy kidneys. Typically, patients receive dialysis treatments up to three times per week and each session can last hours.

There were about 662,000 cases of end-stage renal disease in the country at the end of 2013, according to the U.S. Renal Data System, and treatment costs averaged about $89,000 per patient each year, according to data from the Kidney Project at the University of California San Francisco.

***Red flags***

Sudden spikes in payments to dialysis centers raised red flags for major health insurers, and they complained to the federal government. It was a significant financial hit they were not expecting.

"This is what's causing instability, and it's what's raising prices for everyone," a spokeswoman for America's Health Insurance Plans, an industry group, told the Post-Dispatch.

The effect on the private insurance market, including the exchanges, was obvious to public-policy experts.

"If you suddenly shift these folks into private plans, you're moving cost increases to marketplace plans," said Jack Hoadley, a research professor at Georgetown University's Health Policy Institute.

* * *

DaVita adamantly denies that they pushed any patients toward commercial coverage; rather, they characterize their efforts as providing important patient education.

"DaVita does not steer patients toward any particular insurance option or plan. DaVita educates its patients so that they are able to make informed decisions that are in their best interest," Philipp H. Stephanus, a company senior vice president, said in a statement provided to government officials in September.

***A coordinated effort***

Based on the company's internal emails, the difference between "steering" and "educating" is a subtle one. Those communications, sent during last year's open enrollment period, outline a systematic approach to "educate" hundreds of area patients – and thousands across the country – about individual health plans.

Those emails show that patients were told by DaVita dialysis center employees – either social workers or insurance counselors – that the American Kidney Fund would pay their monthly health insurance premiums so they could gain coverage that is usually out of reach financially. The

> DaVita employees were instrumental in helping patients enroll by helping complete applications for the plans and for the American Kidney Fund's health insurance premium assistance program. The initiative was referred to as the "Medicaid Opportunity" in internal emails.
>
> In regulatory filings, DaVita says it contributes to the American Kidney Fund, but doesn't specify how much. In 2015, the fund provided about $255 million worth of patient assistance to 93,000 kidney failure patients, according to its most recent filing with the Internal Revenue Service.
>
> DaVita's dialysis center employees were given information on which patients to target for the program. From there, they were supposed to engage Medicaid patients in a conversation about new coverage options and the employees' progress was closely tracked.
>
> Some advertising and brochure materials listed talking points for dialysis center employees. In bold large print, a brochure asked Medicaid patients: "What could additional coverage do for you?" The brochure went on to explain that the new coverage would improve access to transplants, to doctors that patients were "unable to see today" and to treatment when traveling out of state.
>
> The brochure advertised the coverage as low to no cost and encouraged patients to reach out to social workers and insurance counselors to learn more.
>
> The brochure boasted that patients may have access to an array of specialists if they opted for commercial coverage. The brochure included short testimonials from unnamed patients and workers, and included the statement: "This insurance is excellent. I haven't been denied anything, and it probably has saved my life."
>
> The internal emails from last fall's open enrollment tally each region's performance. The emails show regions were tracked by how many patients were interested in commercial coverage and the percentage of those that had been talked to by employees about their options.
>
> "Hooray! The Village has completed over 75% of interest conversations, and over 7,200 patients will receive enrollment education on the specific plans available in their market," an email said. (Village is the company's term for itself.).

75. Faced with mounting scrutiny, DaVita was ultimately forced to suspend its patient steering activities. In an October 31, 2016 press release announcing the suspension, the Company stated, in relevant part, as follows:

> With open enrollment starting tomorrow, and in light of recent statements from the Centers for Medicare & Medicaid Services ("CMS"), DaVita announced that, effective immediately, it will suspend support for applications to the American Kidney Fund ("AKF") for charitable premium assistance by patients enrolled in minimum essential Medicaid coverage who are seeking additional coverage on a 2017 ACA Plan.
>
> * * *
>
> Since the implementation of the ACA, a subset of DaVita's Medicaid patients have opted to obtain additional coverage through ACA Plans. In pursuing this additional coverage, they were seeking – and often obtained – access to services beyond dialysis, including access to specialty physicians, more comprehensive drug coverage, increased chance of qualifying for transplantation, and coverage for out-of-state services. While Medicaid patients are eligible to enroll in individual market plans, as confirmed in guidance by CMS[], only a small number have done so, and those who do typically rely on charitable premium assistance, from the AKF or otherwise, because they are ineligible for federal premium tax credits.
>
> The change announced today will affect approximately 2,000 patients, or about one percent of DaVita's total patient population, who have pre-existing minimum essential Medicaid coverage and obtained additional coverage through ACA Plans. If CMS establishes a policy to restrict access by Medicaid patients to ACA Plans or the use of charitable assistance for such plans, these patients likely will revert back to Medicaid-only coverage.
>
> * * *
>
> Because Medicaid reimburses for dialysis at a lower rate than ACA Plans, DaVita estimates that a policy change that prevents patients with minimum essential Medicaid coverage from accessing charitable premium assistance to enroll in ACA Plans would result in a reduction in its annualized operating income of up to approximately $140 million before any offsets. If CMS were to issue a broader ruling that made access to charitable premium assistance unavailable to all ESRD patients on ACA Plans, the estimated financial impact would increase by up to $90 million, based on our estimate that a significant number of ESRD patients would lose their ACA coverage and end up completely uninsured, while others could continue the coverage with federal subsidies.

**DAMAGE TO DAVITA**

76. As a direct and proximate result of defendants' misconduct, DaVita has been severely damaged and injured. Moreover, defendants' faithless acts and/or omissions have irreparably damaged DaVita's credibility, corporate image and goodwill. For at least the

foreseeable future, DaVita will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that DaVita's ability to raise equity capital or debt on favorable terms in the future is now impaired. Further, as a direct and proximate result of defendants' misconduct, DaVita has been named a defendant in class action lawsuits for violations of the federal securities laws.

## DERIVATIVE ALLEGATIONS

77. Plaintiff incorporates ¶¶1-78.

78. Plaintiff brings this action derivatively on behalf of DaVita to redress injuries suffered, and to be suffered, by DaVita as a result of defendants' breaches of fiduciary duty, corporate waste and unjust enrichment.

79. Plaintiff will adequately and fairly represent the interests of DaVita in enforcing and prosecuting the derivative claims.

80. Defendants Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, Valine and Thiry breached their fiduciary duty of loyalty (and disclosure and good faith) and engaged in unlawful conduct. Accordingly, a pre-suit demand on the DaVita Board to commence, let alone vigorously prosecute, this action is a useless and futile act, and is therefore excused.

81. First, the members of DaVita's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests

and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

82. Second, the DaVita Board participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from DaVita's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein, and therefore is not disinterested. As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees and directors, and attendance at management and/or board meetings, each of the defendants knew the adverse non-public information regarding DaVita's business and financial condition, including the patient steering scheme. Pursuant to their specific duties as Board members, the members of the DaVita Board are charged with the management of the Company and to conduct its business affairs. Defendants Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, Valine and Thiry breached their fiduciary duty of loyalty (and disclosure and good faith) owed to DaVita and its shareholders in that they caused false and misleading statements and/or omissions about DaVita's business and financial conditions to be made to DaVita shareholders. Thus, the DaVita Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other defendants who did.

83. Third, the acts complained of constitute violations of the fiduciary duty of loyalty (and disclosure and good faith) owed by DaVita's directors and these acts are incapable of ratification.

84. Fourth, the members of DaVita's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve

their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

85. Fifth, any suit by the directors of DaVita to remedy these wrongs would likely further expose the liability of defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

86. Sixth, DaVita has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the DaVita Board has not filed any lawsuits against defendants or others who were responsible for that wrongful conduct to attempt to recover for DaVita any part of the damages DaVita has suffered and will suffer thereby.

87. Seventh, defendants Berg, Davidson and Valine served as members of the Audit Committee. As such, these defendants were responsible for reviewing the adequacy of DaVita's internal controls, reviewing the integrity of DaVita's annual and quarterly financial results and financial statements, and reviewing DaVita's annual and quarterly earnings press releases. Nonetheless, defendants Berg, Davidson and Valine breached their fiduciary duties, along with the entire DaVita Board, by causing DaVita to make false and misleading statements and/or omissions to shareholders in the Company's earnings releases and SEC filings, as well as by failing to ensure that adequate internal controls were in place at the Company's operations. As a result, defendants Berg, Davidson and Valine are not disinterested and face a substantial likelihood of liability that renders a pre-suit demand upon them futile.

88. Eighth, defendant Thiry is employed full time by the Company, and has received and will continue to receive substantial monetary compensation as a result of that

employment. Defendant Thiry will act to preserve and not threaten his position of control and the perquisites thereof, and therefore is incapable of exercising independent objective judgment in deciding whether to bring this action.

89. Ninth, demand is excused because the conduct alleged herein, including the issuance of false and misleading statements and/or omissions to DaVita shareholders, was not the product of a valid exercise of business judgment. Defendants' misconduct alleged herein, including the issuance of false and misleading statements and/or omissions to DaVita shareholders, was so egregious on its face that Board approval cannot meet the test of business judgment, and a substantial likelihood of director liability for breach of fiduciary duty therefore exists.

90. Tenth, while in possession of adverse material non-public information regarding DaVita's business, financial condition and operations, defendants Berg, Davidson, Nehra, Arway, Valine and Thiry collectively sold 405,216 of their personal DaVita shares for more than $30.7 million in unlawful insider trading proceeds. These defendants profited from the misconduct particularized herein. Consequently, they are not disinterested in the outcome of this litigation and a pre-suit demand is excused.

91. Plaintiff has not made any demand on shareholders of DaVita to institute this action since such demand would be a futile and useless act for the following reasons:

(a) DaVita is a publicly traded company with more than 194 million shares outstanding, and hundreds or thousands of shareholders;

(b) Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c) Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**

**Against All Defendants**
**for Violation of §14(a) of the 1934 Act**

92. Plaintiff incorporates ¶¶1-93.

93. Defendants violated §14(a) of the 1934 Act by soliciting DaVita shareholder votes in the 2016 Proxy Statement for, among other things, the election of directors to the DaVita Board, while misrepresenting and/or failing to disclose that DaVita was improperly steering patients into private healthcare insurance plans in order to maximize Company profits, and, as a result, a significant portion of DaVita's publicly reported revenues and profits were unlawfully obtained. Defendants also violated §14(a) of the 1934 Act by misrepresenting and/or failing to disclose that DaVita lacked of effective internal financial controls, thereby permitting the unlawful patient steering scheme to flourish.

94. Defendants also referenced DaVita's Code of Conduct in the 2016 Proxy Statement, which required compliance with all laws, rules, and regulations. However, while under defendants' stewardship, DaVita engaged in unlawful patient steering practices that violated the letter and spirt of the Company's Code of Conduct. Worse yet, defendants not only failed to disclose the unlawful patient steering scheme, they also failed to disclose that the scheme violated the Company's own Code of Conduct.

95. In the exercise of reasonable care, defendants knew, or should have known, that the 2016 Proxy Statement contained materially false and misleading statements and/or omitted material information when issued. The 2016 Proxy Statement was an essential link in the accomplishment of the continuation of defendants' scheme by which they claimed to adhere to, among other things, the express terms of the Code of Conduct.

96. In the exercise of reasonable care, defendants knew, or should have known, that the statements contained in the 2016 Proxy Statement were materially false and misleading and/or that the 2016 Proxy Statement omitted material information when issued. DaVita has been severely damaged by defendants' materially false and misleading statements and/or omissions contained in the 2016 Proxy Statement.

**COUNT II**

**Against All Defendants for Breach of Fiduciary Duty**

97. Plaintiff incorporates ¶¶1-93.

98. By their wrongful acts and omissions, defendants breached their fiduciary duties by causing or permitting DaVita to engage in a scheme to steer patients with government-subsidized health insurance into private health insurance plans to maximize corporate profits. Defendants also breached their fiduciary duty of loyalty by, among other things, making materially false statements and/or omissions regarding DaVita's business and financial condition in the Company's consolidated financial results, financial statements and shareholder reports, and failing to disclose that material portions of the Company's revenues arose from steering patients otherwise covered by Medicare and Medicaid into more expensive private health insurance programs.

99. As a result of defendants' faithless misconduct, DaVita has been damaged.

100. Plaintiff, on behalf of DaVita, has no adequate remedy at law.

**COUNT III**

**Against All Defendants for Corporate Waste**

101. Plaintiff incorporates ¶¶1-93.

102. By their wrongful acts and omissions, defendants wasted DaVita's valuable corporate assets by, among other things, causing the Company to pay improper fees, salaries, performance-based compensation and other benefits to defendants who breached their

fiduciary duties owed to DaVita and its shareholders. DaVita received no benefit from these improper payments. As a result, defendants damaged DaVita and are liable to the Company for corporate waste.

103. Plaintiff, on behalf of DaVita, has no adequate remedy at law.

**COUNT IV**

**Against All Defendants for Unjust Enrichment**

104. Plaintiff incorporates ¶¶1-93.

105. By their wrongful acts and omissions, defendants were unjustly enriched at the expense and to the detriment of DaVita.

106. All the payments and benefits provided to defendants were at the expense of DaVita. The Company received no benefit from these payments.

107. Plaintiff, on behalf of DaVita, seeks restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation, including insider sales proceeds, obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

108. Plaintiff, on behalf of DaVita, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A. Awarding money damages against all defendants, jointly and severally, for all damages and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

B. Directing all defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all fees, salaries, performance-based compensation, benefits and insider sales proceeds, and imposing a constructive trust thereon;

C. Directing DaVita to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, the federal healthcare laws, rules and regulations, the federal securities laws and state corporation laws regarding fiduciary duties;

D. Awarding punitive damages;

E. Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

OF COUNSEL:

ROBBINS GELLER RUDMAN
& DOWD LLP
Benny C. Goodman III
Erik Luedeke
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel.: (619) 231-1058
Fax: (619) 231-7423

VANOVERBEKE MICHAUD &
TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Tel.: (313) 578-1200
Fax: (313) 578-1201

ANDREWS & SPRINGER LLC

By /s/ *Peter B. Andrews*
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Tel.: (302) 504-4957
Fax: (302) 397-2681

DATED: June 9, 2017